22CA1436 Peo v Souders 02-20-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1436
Boulder County District Court No. 20CR1625
Honorable Thomas F. Mulvahill, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sean Daniel Souders,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Johnson and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 20, 2025

Philip J. Weiser, Attorney General, Abigail M. Armstrong, Assistant Attorney
General Fellow, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Stephen Arvin, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Sean Daniel Souders appeals the judgment of conviction entered on jury verdicts finding him guilty of vehicular homicide, reckless driving, and third degree assault.  He contends that the dismissal of a prospective juror of color at his trial violated *Batson v. Kentucky*, 476 U.S. 79 (1986).  In addition, Souders contends that the court plainly erred by admitting (1) a state trooper's testimony that there was probable cause for obtaining a search warrant for Souders's truck and a warrant for Souders's arrest and (2) an expert's testimony regarding the mental state for the counts on which the jury eventually convicted Souders.  We affirm.

## I.     Background

¶ 2     The evidence at trial showed that, on a rainy summer evening, Souders was driving a twelve-ton dump truck on a two-lane road in Boulder County.  As Souders attempted to navigate a sharp curve, he crossed the double-yellow center line and crashed head-on into an oncoming MG convertible.  Souders's passenger testified that Souders said, "[O]h fuck," in the moments before the impact.  The dump truck drove over the top of the MG before veering off the road and crashing into the side of a house, where the driver of the MG lived with his parents and siblings.

¶ 3    The MG's driver died at the scene.  The driver's passenger, his older brother, was injured.  The house sustained more than $120,000 in damage.

¶ 4    The prosecution charged Souders with vehicular homicide, criminal mischief, reckless driving, and third degree assault based on information that he lost control of the truck because he was driving too fast for the conditions.

¶ 5    At trial, the prosecution presented evidence that the speed limit before the curve was fifty miles per hour.  As drivers approached the curve, the limit dropped to thirty-five miles per hour.  Three expert witnesses (two for the prosecution and one for the defense) estimated Souders's speed as he approached the curve.  One of the prosecution's experts testified that Souders approached the curve at fifty-one miles per hour.  The other prosecution expert opined that Souders had been driving between forty-nine and sixty-five miles per hour at the time.  The defense expert testified that Souders was traveling between forty-two and fifty-two miles per hour when he reached the curve.

¶ 6    All three experts agreed that Souders exceeded the posted speed limit.  But defense counsel theorized that Souders only

exceeded the "critical speed" — the maximum speed at which a vehicle could navigate a curve without losing control — by two miles per hour, which, defense counsel argued, did not amount to recklessness.

¶ 7    A jury found Souders guilty of vehicular homicide, reckless driving, and third degree assault (the three counts) and acquitted him of criminal mischief.  The court merged Souders's vehicular homicide and reckless driving convictions and sentenced him to twelve years in the custody of the Department of Corrections.

## II.    *Batson* Challenge

¶ 8    Souders contends that the prosecutor struck a prospective juror of color because of her race, in violation of *Batson.*  We are unpersuaded.

### A.    Additional Background

¶ 9    After seating a panel of twenty-five prospective jurors, the court asked the members of the venire to introduce themselves and to provide basic background information: age; occupation; education; household; city of residence; duration of residence in the state and county; whether they have friends or relatives in law

enforcement; and what they like to do, read, listen to, and watch in their free time.

¶ 10     When it was her turn to provide this information, Juror V gave her name and said,

> I'm 20.  I'm currently working at Home Depot
> as a cashier.  I'm a rising junior at CU
> Boulder, and I'm to get an arts degree.  Well,
> currently, I'm living in . . . an apartment,
> although I may be moving in with my family by
> the end of the week.  I don't have any children.
> My uncle, I think he's a retired police officer,
> and my cousin might still be a police officer[;]
> I'm not actually sure about that.  I've lived in
> Boulder for 19 years, Boulder County as well.
> I like to go hiking.  And I don't do a lot of
> reading.  And I listen to all kinds of music.

During voir dire, the prosecutor asked the panel about driver's licenses:

> PROSECUTOR: So with a show of hands, then,
> how many of you drove here today?  Is that
> everybody?
>
> . . . .
>
> And how many of you are licensed to drive?
> Show of hands.  Now, if your hand went up for
> the first but not the second, we have another
> issue.  So everybody raised their hands.  Do we
> have anybody here who has a commercial
> driver —
>
> THE COURT: . . . I think [Juror V] did not raise
> her hand the first time —

PROSECUTOR: I'm sorry.

THE COURT: — to the first question.

PROSECUTOR: Is that right?

JUROR V: Yeah, I walked here.

PROSECUTOR: You walked here. Okay. Is it a long walk?

JUROR V: Not really, no.

PROSECUTOR: And did you raise your hand for having a license to drive?

JUROR V: Yeah.

PROSECUTOR: Very good. Thank you, Your Honor. Thank you, [Juror V].

Neither side engaged in a further colloquy with Juror V. Although the prosecution and defense counsel then directed questions to the entire panel, Juror V did not respond to any of those questions.

¶ 11    After the prosecutor used a peremptory strike to dismiss Juror V, defense counsel challenged the strike on the grounds that Juror V was "a member of a minority group." Defense counsel acknowledged that both sides' questioning of Juror V was "perfunctory" and that she was "quiet," but argued that she provided appropriate responses to the questions asked and "gave no indication at all that she had any difficulty with any of the rules of

5

law that were articulated." Defense counsel concluded that Juror V "said absolutely nothing that would be an indicia [sic] that she would not be an appropriate juror in this case."

¶ 12 In response, the prosecutor said that "there was no inappropriate or improper reason" for striking Juror V, explaining that he had struck her because she was "on the rather quiet side" compared to a panel of "strong" jurors, some of whom were "more vocal than others" and "volunteer[ed] more information than others."

¶ 13 The court concluded that the prosecutor "met [his] burden to show [a] race-neutral explanation" for striking Juror V. The court made the following findings of fact in reaching this conclusion:

- Juror V was "particularly quiet, and not just verbally, but even physically reserved."

- Juror V was "very reserved" in her responses to the court and counsel and was "not forthcoming with much information."

- The responses that Juror V provided "didn't give a whole lot of information," and she was "non-emotive in making her responses."

6

- "There are a bunch of other people on the panel, minority or not, who have provided information, indicating that they are acceptable jurors to the Prosecution."

- "[S]he just is not someone who gives much information at all."

### B. Applicable Law and Standard of Review

¶ 14 The Equal Protection Clause of the Fourteenth Amendment precludes the use of a peremptory challenge to strike a juror based on race. *Batson*, 476 U.S. at 86. "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies [the defendant] the protection that a trial by jury is intended to secure." *Id.* In addition, "by denying a person participation in jury service on account of his race, the State unconstitutionally discriminate[s] against the excluded juror" and "undermine[s] public confidence in the fairness of our system of justice." *Id.* at 87; *see People v. Ojeda*, 2022 CO 7, ¶ 20, 503 P.3d 856, 861-62.

¶ 15 *Batson* established a three-step analysis for evaluating claims of racial discrimination in jury selection:

> (1)    whether the objecting party made a prima facie showing that the challenged peremptory strike was race-based;
>
> (2)    whether the striking party gave a race-neutral reason for the strike; and
>
> (3)    whether the objecting party proved purposeful discrimination.

*People v. Romero*, 2024 CO 62, ¶ 45, 555 P.3d 582, 595; *People v. Johnson*, 2024 CO 35, ¶ 17, 549 P.3d 985, 990.

¶ 16    At the first step, the opponent of the peremptory strike must make a prima facie showing that the proponent used the strike because of the potential juror's race. *Romero*, ¶ 33, 555 P.3d at 593. This step is "easily satisfied," *id.* (quoting *Craig v. Carlson*, 161 P.3d 648, 655 (Colo. 2007)), so long as "the totality of the circumstances gives rise to an inference of racial motivation," *id.*

¶ 17    At the second step, the proponent of the strike must offer a race-neutral explanation for the strike. *Id.* at ¶ 34, 555 P.3d at 593. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered [at step two] will be deemed race neutral." *Id.* at ¶ 35, 555 P.3d at 594 (alteration in original) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)).

¶ 18    After the opponent is given an opportunity to rebut the proponent's explanation, the third step requires the court to determine "whether the objecting party has shown purposeful racial discrimination by a preponderance of the evidence." *Id.* at ¶ 39, 555 P.3d at 594. Relevant considerations at the third step include the striking party's demeanor, the reasonableness and plausibility of the proffered race-neutral explanation, and whether the advanced rationales are rooted in accepted trial strategy. *Id.* at ¶ 37, 555 P.3d at 594. "[I]f the court determines that a peremptory strike was 'motivated in substantial part by discriminatory intent,' the court may conclude that the strike was purposefully discriminatory under *Batson*." *Id.* at ¶ 39, 555 P.3d at 594 (quoting *People v. Madrid*, 2023 CO 12, ¶ 35, 526 P.3d 185, 194).

¶ 19    "[W]hen the striking party's race-neutral explanation is predicated on the demeanor of a prospective juror, the trial judge is . . . best suited to assess that demeanor." *Id.* at ¶ 42, 555 P.3d at 595; *People v. Beauvais*, 2017 CO 34, ¶ 25, 393 P.3d 509, 517.

¶ 20    We review a court's step-three determination for clear error. *Romero*, ¶ 45, 555 P.3d at 595. "Inasmuch as a step-three ruling is a determination of demeanor and credibility, appellate courts

9

understandably afford such rulings great deference and reverse only under 'exceptional circumstances.'" *Id.* at ¶ 44, 555 P.3d at 595 (quoting *Beauvais*, ¶ 25, 393 P.3d at 517).

## C. The Court Did Not Clearly Err by Crediting the Prosecution's Race-Neutral Reason for Striking Juror V

¶ 21 Souders argues that the prosecutor's race-neutral explanation for striking Juror V — her quiet demeanor — was not credible because it was caused by the prosecutor's limited questioning of her. We perceive no clear error in the court's step-three analysis.

¶ 22 As an initial matter, the parties agree that Souders generally preserved his argument regarding the prosecutor's exercise of a peremptory challenge to strike Juror V. But we are not convinced that defense counsel alerted the court to the specific argument regarding the strike that he raises on appeal — that a prosecutor's race-neutral explanation for striking a juror of color is not credible if the strike was premised on the prosecutor's own actions (or inactions) during voir dire. *See People v. Cooley*, 2020 COA 101, ¶ 24, 469 P.3d 1219, 1224 ("An objection is sufficiently specific when it draws the court's attention to the asserted error."). Although defense counsel acknowledged that his and the

prosecutor's voir dire of Juror V was "perfunctory," his primary argument at trial was that the prosecutor's strike violated *Batson* because nothing that Juror V said indicated that she could not be fair. Defense counsel did not argue that a prospective juror's quiet demeanor is not a credible race-neutral explanation for a peremptory strike when the prosecutor asked the juror few questions.

¶ 23    Even assuming that defense counsel's acknowledgement was sufficient to alert the court to the "sum and substance" of the specific *Batson* argument that Souders presents on appeal, *Cooley*, ¶ 24, 469 P.3d at 1224 (quoting *In re Estate of Ramstetter*, 2016 COA 81, ¶ 68, 411 P.3d 1043, 1053), we reject the argument on the merits.

¶ 24    First, the prosecutor's race-neutral explanation for the strike was more nuanced than how Souders frames it in his opening brief. While the prosecutor said, "This is a challenge that's based on the fact that I know very little about her," the rest of his explanation for striking Juror V illustrates that the prosecutor's motivation for the strike was Juror V's quiet and unforthcoming demeanor compared to that of other jurors, and not merely that he lacked information

about her.  In analyzing Souders's *Batson* argument, we are mindful that the court was in a better position than we are to assess Juror V's demeanor.  *See Romero*, ¶ 44, 555 P.3d at 595; *Beauvais*, ¶ 25, 393 P.3d at 517.

¶ 25     While we cannot confirm on a cold record that Juror V was "quiet," "physically reserved," and "non-emotive," the record supports the court's findings that Juror V's answers "didn't give a whole lot of information."  For example, some of the prospective jurors provided detailed responses when asked about loved ones in law enforcement.  In contrast, in responding to that question, Juror V said that she might have two relatives in law enforcement but that she was "not actually sure about that."  Her responses to questions regarding what she liked to read, listen to, and watch in her free time — that she does not "do a lot of reading" and listens to "all kinds of music" — did not shed much light on her personality or interests.  Further, she gave only a one-word answer to the prosecutor's question whether she had a driver's license.

¶ 26     In his opening brief, Souders points out that the information Juror V provided about herself was responsive to the court's prompting and not to the prosecutor's questioning.  But Souders

does not cite any binding authority holding that this is a meaningful distinction under *Batson*. The Colorado case that Souders cites as principal support for this argument is *People v. Gabler*, 958 P.2d 505, 508 (Colo. App. 1997), in which a division of this court said that a prosecutor's failure to "question [a] prospective juror *at all* during voir dire" raised "the inference of purposeful discrimination." In *Gabler*, the prosecutor accepted an all-white panel, forgoing his remaining peremptory challenges. 958 P.2d at 507. But when "two African-Americans join[ed] the panel" after the defense exercised peremptory strikes to members of the original panel, the prosecutor struck both without asking them any questions. *Id.*

¶ 27 In *People v. Licona-Ortega*, 2022 COA 27, ¶ 63, 511 P.3d 721, 734, a division of this court held that a prosecutor's "brief" questioning of a prospective juror "alone does not support a conclusion that the trial court's step-three determination was clearly erroneous." In *Licona-Ortega*, the prosecutor asked the prospective juror two questions. *Id.* at ¶ 49, 511 P.3d at 732. After defense counsel briefly followed up with the juror, the prosecutor

struck the juror based on her answer to defense counsel's questions. *Id.* at ¶¶ 50-52, 511 P.3d at 732.

¶ 28 We conclude that the facts in this case are analogous to those in *Licona-Ortega*. The prosecutor did not forgo his remaining peremptory challenges until a juror of color was placed on the panel. In addition, unlike the prosecutor in *Gabler*, the prosecutor asked Juror V questions. For purposes of a *Batson* analysis, there is a material distinction between asking a juror of color some questions and asking the juror no questions before striking her. In addition, we decline to accept Souders's invitation to wade into the muddy waters of deciding whether a prosecutor's questioning of a juror was or was not "meaningful" under these circumstances, particularly as Souders cites no Colorado case instructing us to engage in this problematic exercise.

¶ 29 Souders's reliance on *Maddox v. State*, 708 So. 2d 220, 227 (Ala. Crim. App. 1997), as well as other out-of-state cases, does not change our analysis. In *Maddox*, the prosecutor's primary explanation for dismissing a prospective juror was, "When asked questions that would have evoked a response from somebody in [the juror's] position, he did not respond at all." *Id.* at 226. The

prosecutor had not asked the juror any follow up questions, and the prosecutor did not explain what he meant by the juror's "position." *Id.* at 226-27. Under these circumstances, the Alabama court concluded that the prosecutor's race-neutral reason for striking the juror was "pretextual." *Id.*

¶ 30 Contrary to Souders's suggestion that the prosecutor struck Juror V because of her limited answers to questions during voir dire, the prosecutor provided a race-neutral explanation for the strike based on Juror V's *demeanor.* Unlike in *Maddox,* the court made detailed findings confirming the prosecutor's observation of the juror's demeanor, indicating that the prosecutor's reason for the strike was not pretextual. Because the court was able to view Juror V's demeanor, and nothing in the record indicates the prosecutor's and the court's observations were contrary to the court's findings, we conclude that this case does not present the "exceptional circumstances" that permit an appellate court to second-guess a trial court's step-three *Batson* analysis. *Romero,* ¶ 44, 555 P.3d at 595 (quoting *Beauvais,* ¶ 25, 393 P.3d at 517).

¶ 31 Accordingly, we conclude that the court did not err by permitting the prosecutor to strike Juror V.

### III. Evidentiary Issues

¶ 32    Souders next contends that the court erred during trial by failing to strike testimony from two expert witnesses, even though defense counsel did not object to such testimony.

### A. Standard of Review

¶ 33    We review a trial court's evidentiary rulings for an abuse of discretion. *Rojas v. People*, 2022 CO 8, ¶ 16, 504 P.3d 296, 302. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or when it misapplies the law. *People v. Johnson*, 2021 CO 35, ¶ 16, 486 P.3d 1154, 1158.

¶ 34    Because Souders did not preserve his evidentiary arguments, we review for plain error. *See Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120. To be plain, an error must be obvious and substantial. *Id.* An error is obvious if it is "so clear-cut" that the court "should be able to avoid it without benefit of objection." *People v. Crabtree*, 2024 CO 40M, ¶ 42, 550 P.3d 656, 667 (quoting *Romero v. People*, 2017 CO 37, ¶ 6, 393 P.3d 973, 976). "Consequently . . . [the] error must contravene a clear statutory command, a well-settled legal principle, or established Colorado case law." *Id.* An error is substantial if it "so undermined the

fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Id.* at ¶ 43, 550 P.3d at 667 (quoting *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987)).

### B. Probable Cause Testimony

¶ 35 Souders contends that the court reversibly erred by failing to strike a law enforcement officer's testimony that there was probable cause for obtaining a search warrant for Souders's truck and, later, an arrest warrant for Souders. Souders asserts that the officer's references to probable cause wrongfully informed the jury that "law enforcement and the courts had determined there was sufficient evidence to find Souders guilty of an offense." We conclude that, although the error was obvious, it was not plain because it was not substantial.

¶ 36 Sergeant John Ray, the lead investigator of the incident, testified that he regularly inspects vehicles after a crash as part of his investigations. The prosecutor asked him the following:

> PROSECUTOR: [W]ith regard[] to the Defendant's dump truck, did you obtain a warrant from the Court to do so?
>
> WITNESS: I did.

17

PROSECUTOR: What's the process for that just briefly?

WITNESS: Sure. To obtain a warrant, I have to establish essentially probable cause to — to be able to search for whatever I think will help either . . . support or . . . debunk . . . what the evidence is telling us at that point in time. So you write a long narrative with all of your information, and your . . . data, and the things that you've observed so far. And then you ask the judge to give you authority to see if you can find any other evidence pertaining to whatever it is you're investigating.

PROSECUTOR: . . . [D]id you receive[] judicial approval to execute the search warrant on the dump truck?

WITNESS: Yes, sir.

PROSECUTOR: And is the search warrant based on probable cause, the person may have . . . committed a criminal offense?

WITNESS: Yes, sir.

Ray then discussed his investigation in detail. The prosecutor concluded his direct examination of Ray by asking, "[D]id you request and obtain from the Court an arrest warrant for [Souders]?" Ray answered, "Yes, sir."

¶ 37    "[W]here probable cause to arrest or search is not at issue, it is improper to present to the jury evidence about obtaining an arrest or search warrant." *People v. Mullins*, 104 P.3d 299, 301 (Colo.

App. 2004); *see also Howard-Walker v. People*, 2019 CO 69, ¶ 33, 443 P.3d 1007, 1013 (explaining that allowing a detective to testify "there was probable cause to support a search warrant and an arrest warrant" was an error for purposes of a cumulative error analysis); *People v. Walters*, 148 P.3d 331, 338 (Colo. App. 2006) ("[E]vidence regarding a search warrant is generally inadmissible as irrelevant when probable cause is not an issue . . . .").

¶ 38     In *Mullins*, a division of this court concluded that admission of testimony concerning an arrest warrant was a substantial error and, therefore, grounds for reversal under the plain error standard of review. 104 P.3d at 301. The division noted, "A plain error analysis requires a consideration of various factors, including the strength of the evidence against the defendant, the posture of the defense, and any persistent, improper remarks by the prosecutor." *Id.* It then concluded that, for three reasons, the court had plainly erred by permitting the witness to explain that a prosecutor must show probable cause to obtain an arrest warrant — the evidence against the defendant was not overwhelming, the probable cause testimony directly undermined the theory of defense, and the

prosecutor made other improper statements during closing argument. *Id.* at 301-02.

¶ 39 The court's admission of Ray's testimony regarding probable cause was an obvious error because the testimony violated established Colorado case law. *See Crabtree,* ¶ 42, 550 P.3d at 667. Souders's trial was held in 2022. By the time of Souders's trial, the Colorado Supreme Court and divisions of this court had determined that testimony about the legal standard for obtaining an arrest or search warrant is improper where probable cause to arrest or search is not at issue. *See Howard Walker,* ¶ 33, 443 P.3d at 1013; *Walters,* 148 P.3d at 338; *Mullins,* 104 P.3d at 301. *But see People v. Penn,* 2016 CO 32, ¶¶ 33, 40, 42, 379 P.3d 298, 305-07 (holding it was not plain error for the trial court to permit an investigating officer to testify that he had reason to arrest the defendant because such statement simply explained the officer's reason for contacting the defendant and did not convey the message that the officer believed the defendant was guilty).

¶ 40 But even if the court's error in allowing the testimony was obvious, it was not substantial for three reasons.

¶ 41    First, the evidence of Souders's recklessness was overwhelming.  His own expert estimated that he exceeded the posted speed limit by between seven and seventeen miles per hour on a sharp curve, while driving a large commercial vehicle in the rain.

¶ 42    Nonetheless, Souders contends that Ray's testimony regarding the search and arrest warrants prejudiced him because the testimony could have conveyed the message to the jurors that Souders committed a "criminal offense."  But the undisputed evidence established that Souders exceeded the posted speed limit.  Thus, his counsel had no choice but to acknowledge, and attempt to mitigate, Souders's violation of the law.  In his closing argument, defense counsel said, "Was [Souders] speeding?  Yes.  No question about it.  Was he going too fast for conditions?  Yes, no doubt about it."  Defense counsel explained that Souders only exceeded the "critical speed" by two miles per hour and asserted, "Does that make him reckless under the definition of reckless?  No, it does not.  That is not an automatic."

¶ 43    Thus, by considering the undisputed evidence that Souders exceeded the posted speed limit, the jury could conclude that he

21

was unable to navigate the curve safely. *See Walters*, 148 P.3d at 338 (finding no substantial error where the defendant admitted to the facts underlying the charge).

¶ 44 The jury's acquittal of Souders on the criminal mischief count does not persuade us otherwise. To obtain a conviction on that count, the prosecution needed to prove a different mental state than recklessness, as was required for the three counts. To prove the criminal mischief count, the prosecution needed to establish that Souders knew that his actions could result in damage to the house. Thus, the jury's acquittal on that count has no bearing on whether the evidence also established that Souders acted recklessly for purposes of the three counts.

¶ 45 Second, Ray's testimony regarding the search warrant and the arrest warrant did not directly relate to or undermine Souders's theory of defense. Souders's theory was that he only exceeded the "critical speed" by two miles per hour, suggesting that his driving, while perhaps careless, was not reckless. Unlike in *Mullins*, where the testimony regarding probable cause reflected on the merits of the defense of self-defense, Ray's testimony did not undermine Souders's defense that he had not acted recklessly. The key

22

question regarding the three counts was not merely whether Souders drove too fast for the conditions. Rather, the jurors were tasked with deciding whether Souders's behavior amounted to recklessness. If the jury believed that the prosecution failed to present sufficient evidence that Souders had acted recklessly, it could have accepted the defense's argument that, although Souders committed a criminal act (speeding), he was nonetheless not guilty of the charged offenses. Thus, Ray's testimony that Souders challenges on appeal was less prejudicial than was the challenged testimony in *Mullins*.

¶ 46 Third, unlike the defendant's argument in *Mullins*, Souders did not assert that prosecutorial misconduct during closing argument compounded the error. During closing argument, the prosecutor did not refer to Ray's testimony regarding the search warrant and the arrest warrant.

¶ 47 In addition, we do not agree with Souders that Ray's challenged testimony was akin to the evidence that the division held was inadmissible in *People v. Mendenhall*, 2015 COA 107M, ¶¶ 62-63, 363 P.3d 758, 772 — testimony regarding the prosecution's screening process before making a charging decision — or the

prosecutor's assertion during closing argument that the supreme court determined was improper in *Domingo-Gomez v. People*, 125 P.3d 1043, 1052 (Colo. 2005) — "There is a screening process for charging cases, and it takes a lot more than somebody saying that person did it. It takes the type of evidence that we have here."

¶ 48    While we do not condone the admission of evidence that probable cause supported the issuance of a search warrant or an arrest warrant, we cannot say that, in this case, it "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Crabtree*, ¶ 43, 550 P.3d at 667.

## C.    Mental State Testimony

¶ 49    Finally, Souders contends that the court should have stricken his own expert witness's testimony on cross-examination — to which defense counsel did not object — that Souders now claims usurped the jury's factfinding role.

¶ 50    Defense counsel called Adam Michener to testify as an expert in accident reconstruction. During cross-examination, the prosecutor asked Michener the following:

PROSECUTOR: And would you agree with me that [Souders] knew he was on the wrong side of the road based on your review of [a diagram of the scene of the incident that showed the path of the truck]?

EXPERT: Yeah, I'd have to think so. I mean, even if you just looked at the tire marks themselves, right? He's . . . trying to steer as far to the right as he can. He . . . realizes that he's not [o]n the right side of the road.

PROSECUTOR: And he knows he's about to hit the MG before impact.

EXPERT: Yeah, I think so. Based on [his passenger's] comments.

PROSECUTOR: And would you agree with me that based on the size of the dump truck and the size MG, that he must have been aware of at that moment in time, that he was practically certain to crash into the MG?

EXPERT: Yeah. I mean . . . at [what] point we'd want to say that he officially knew that he was going to crash in[to] the MG, I don't know. That's going to be difficult to say. But yes, at some point prior to collision I would imagine that he realized what's going to happen.

¶ 51     Souders argues that Michener's responses to the prosecutor's questions amounted to "testimony that a crucial legal standard" — Souders's mental state — had been "met or exceeded." Specifically, he contends that the "practically certain" language in the prosecutor's question echoed the legal definition of "knowingly," an

25

even higher-burden mental state than the mental state of recklessness that the prosecution had the burden to prove to convict Souders on the three counts. *See* § 18-1-501(6), C.R.S. 2024 ("A person acts 'knowingly' or 'willfully', with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result."). We disagree.

¶ 52 Although an expert may offer testimony that embraces an ultimate issue, the expert may not usurp the role of the fact finder. CRE 704; *see People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011). The mental states that the prosecution had the burden to prove in this case were (1) recklessness — *see* § 18-3-106(1), C.R.S. 2024 (the vehicular homicide count); § 18-3-204(1)(a), C.R.S. 2024 (the third degree assault count); § 42-4-1401, C.R.S. 2024 (the reckless driving count) — and (2) knowledge, *see* § 18-4-501(1), (4)(g), C.R.S. 2024 (the criminal mischief count). "A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that a result will occur . . . ." § 18-1-501(8). "A person acts 'knowingly' . . . with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result." § 18-1-501(6).

¶ 53    We agree that Michener's testimony tended to establish that, moments before the collision, Souders knew he would crash into the MG.  But such testimony did not shed light on either of the mental states that the prosecution had the burden of proving.  To convict Sounders on the vehicular homicide and assault counts, the prosecution bore the burden of proving that Souders "consciously disregard[ed] a substantial and unjustifiable risk" that his behavior would result in the injury or death of another.  § 18-1-501(8).  In contrast, to convict Souders on the criminal mischief count, the prosecution bore the burden of proving that Souders knew his conduct was "practically certain" to cause damage to the house.  § 18-1-501(6).  Neither of those mental states required the prosecution to prove that Souders realized, seconds before the collision, that he was about to hit the MG.  Because the jury was not charged with determining whether Souders was aware that a collision was likely in the moments before his truck struck the MG, we conclude that Michener's challenged testimony did not usurp the jury's role as fact finder.

## IV.   Disposition

¶ 54    The judgment is affirmed.

JUDGE JOHNSON and JUDGE MOULTRIE concur.